UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

JHON E. CARDENAS, CESAR A. ROMERO,
and JOSE DAVID PEREZ MEJIA, *on behalf of*                    **Case No.: 17-cv (5150)(FB)(RML)**
*themselves and others similarly situated,*

                                    Plaintiff,                    **Plaintiffs' Rule 56**
                                                **Statement of Undisputed Facts**

         -against-

EDITA'S BAR & RESTAURANT,  INC. d/b/a
FLAMINGO RESTAURANT AND LOUNGE,
DOLL'S REST INC. d/b/a DOLL'S, and
EDITH F.   VALDIVIA a/k/a EDITH F. D'ANGELO,

                                 Defendants.
------------------------------------------------------------------------X

The following are undisputed facts in the above captioned suit:

1.  Defendant Edita's Bar and Restaurant Inc. d/b/a Flamingo Restaurant and Lounge ("Edita's" or "Flamingo's" in deposition transcripts) is a corporation whose chief executive officer, sole owner, and sole corporate officer is Defendant Edith F. D'Angelo ("D'Angelo"). Exhibit 1, NYS Entity Information; Exhibit 2, Excerpt from D'Angelo Deposition Day 1, pp. 8:2-9:23.

2.  Defendant Edita's operates a bar at 85-12 Roosevelt Avenue, Jackson Heights, New York 11372. Exh. 1, pp. 10:3-8.

3.  Defendant Doll's Rest Inc. d/b/a Doll's ("Doll's") is a corporation whose chief executive officer, part owner, and a corporate officer is Defendant Edith F. D'Angelo. Exhibit 3, NYS Entity Information for Doll's; Exh. 2, pp. 10:21-11:21. Mr. Luis Ruiz also is a part owner and corporate officer for Defendant Doll's. Exh. 2, pp. 11:7-21.

4.  Mr. Luis Ruiz also is a manager at Defendant Edita's and operates Defendant Doll's simultaneously. Exh. 2, pp. 12:3-6.

5.  Defendant Edita's and Defendant Doll's both hire workers who apply to work for Defendant Edita's as there is no independent hiring process for Defendant Doll's. Exh. 2, pp. 13:13-14:16.

6.  An individual named Wesley Laito is a manager for both Defendant Edita's and Defendant Doll's. Exh. 2, pp. 16:10-23.

7.  Defendant D'Angelo has the power to hire and fire, set schedules, and set pay schedules at both Defendant Edita's and Doll's. Exh. 2, pp. 19:2-21:14.

8.  Defendant D'Angelo's husband buys the food for both bars. Exh. 2, p. 23:16-17.

9.  At some point beginning in or around 2007, Defendants used a fingerprinting system to keep track of how many hours each Plaintiff worked. Exh. 2, pp. 39:5-40:9.

10. That machine broke, however no records were produced to show when it broke.

11. Defendant D'Angelo testified that it broke in either 2010, 2013, or 2014. Exh. 2, pp. 25:25-27:5; Exhibit 4, D'Angelo Deposition Day 2, pp. 39:17-40:2; Exhibit 5, D'Angelo Deposition Day 3, pp. 23:19-24:2.

12. Defendant D'Angelo testified that after this she kept track of employees' hours using schedules which were thrown away each day and not maintained. Exh. 4, p. 40:3-14.

13. Defendant D'Angelo testified that the sole basis for determining what employees were to be paid was the schedules and that the schedules were used to create all pay records. Exh. 4, pp. 41:2-42:18. Defendant D'Angelo was asked to search to see if she could find any schedules and she could not. Exh. 5, p. 56:8-17.

14. Defendant D'Angelo claimed that she kept time records or tip records for which employees' pay was based but that she destroyed those records on a daily basis "because [she] didn't need it." Exh. 2, p. 42:16-43:5.

15. Employees were not given any wage notices describing what they were to be paid per hour, instead she claimed that the information was given verbally. Exh. 4, p. 39:3-16.

16. Defendant Edita's employs around twelve (12) people regularly including managers, waiters, barmaids, and a dj. Exh. 4, p. 15:7-12.

17. Defendant Edita's employed approximately forty-five (45) to fifty (50) girls who dance with patrons for a fee. Exh. 4, pp. 17:7-19:13.

18. Defendant Doll's employs between six (6) and seven (7) employees regularly plus the forty (40) to fifty (50) dancers who also work for Defendant Edita's. Exh. 4, p. 43:4-22.

19. Both Defendants Edita's and Doll's share a DJ. Exh. 4, p. 44:14-24.

20. When someone calls in sick, Defendant D'Angelo would send someone from the other bar to cover for them. Exh. 4, pp. 45:19-46:5.

21. Both Defendant Doll's and Defendant Edita's serve "the same finger foods." Exh. 4, p. 46:6-8.

22. Both Defendant Doll's and Defendant Edita's have the same "rules of employment." Exh. 4, pp. 66:20-67:2; Exhibit 6, Rules of Employment.

23. Defendant D'Angelo interviewed applicants to work at both Defendant Doll's and Defendant Edita's at the same time in the same, central office where she conducted business for both locations. Exh. 4, pp. 65:24-66:19.

24. Applicants filled out a single application to work at both locations. Exh. 4, p. 64:9-11.

25. Employees are told when they are hired that they "have to work one day at Doll's if they want to work." Exh. 4, pp. 64:24-65:8. ("Q. So it's required as part of employment to work on the [sic] both locations? A. Yes.")

26. Defendant D'Angelo testified that all employees were paid on a daily basis in cash. Exhibit 7, D'Angelo 4th day of Deposition, pp. 16:24-19:16.

27. Defendant D'Angelo testified that the only records of these daily payments were receipts which she maintained. Id.

28. Defendant D'Angelo testified that her QuickBooks records, pay stubs, and checks were maintained only for the purpose of determining how much employees would be required to repay to her for tax contributions. Id.

29. The receipts she references only describe how much in tips were paid and not the amount of hourly wage paid. Exhibit 8, Tip Receipt Examples.

30. Defendant D'Angelo could not provide any specific examples of when she asked for information from her accountant about how much to pay employees, could not identify which accountant she asked, and could not produce any documents to show that she asked an accountant about how she should pay employees. Exh. 5, pp. 9:25-12:14.

31. Defendant D'Angelo claimed that an article produced in discovery which was dated December 5, 2017 had been printed by her office and had been the basis for her paying employees the rates she paid. Exh. 5, pp. 38:24-43:6.

32. This article had been printed on October 7, 2019, two weeks after her prior deposition date (see Exh. 4 dated September 25, 2019). Defendant D'Angelo claimed it had just been in her office and that it had been a basis for her pay practices. Id.; Exhibit 9, Article Printed October 7, 2019.

33. Defendants produced tip card records for a limited period of dates but provided no records showing how much each Plaintiff was paid on a daily basis and did not provide a complete record of how much each Plaintiff received. Exhibit 10, Spreadsheet describing records produced for each Plaintiff (Produced on DVD in Excel Format due to size).

34. Defendant D'Angelo testified that Defendant Edita's had sales of approximately $450,000 in 2017 and 2018 and that Defendant Doll's had sales of approximately $200,000 in 2017 and 2018 for a combined sales of $650,000 for those years. Exh. 2, p. 70:2-19. Further, Defendants bought alcohol which is produced out of state for sale in the restaurant. Exh. 18, Beer and Liquor Invoices.

3

## Facts relevant to Plaintiff JHON CARDENAS

35. Plaintiff Cardenas began working for the defendants as a waiter at Flamingo on or about November of 2010. On or about January of 2011, defendant D'Angelo required plaintiff Cardenas to also work at another bar that she had opened in Jamaica, New York, named Doll's. Plaintiff Cardenas worked for the defendants until on or about July of 2017. Plaintiff Cardenas, like all waiters and managers of the bars, rotated between Flamingo and Doll's. Exhibit 11, Plaintiff Cardenas' Affidavit in Support, ¶ 3-4.

36. Plaintiff' Cardenas concludes that the defendants bought the supplies, including but not limited to napkins, straws, paper towels, lemons, cups, and cleaning supplies, for both bars at the same time. The basis of plaintiff Cardenas' belief is that defendant D'Angelo's husband would drop off the supplies at one bar and then go to the other bar to drop off the rest of them. Defendant D'Angelo's husband specially told plaintiff Cardenas more than once that he was going to the other bar to drop off the rest of the supplies after plaintiff Cardenas helped him unload them. Id at ¶ 5.

37. Plaintiff Cardenas was always paid at the same time for Flamingo and Doll's and was always paid at Flamingo. Plaintiff Cardenas usually worked from 6:00 p.m. to 7:00 p.m. to 5:30 a.m., five or six days a week. Plaintiff Cardenas would cover co-worker's shifts often and work seven  days a week. Between both bars, plaintiff Cardenas usually worked approximately between fifty-five and sixty-six hours per week, not including the shifts he would cover for his co-workers. Id at ¶ 7-8.

38. Up until on or about January of 2015, plaintiff Cardenas was paid $40 per shift and an extra $10 to stay on Saturdays and Sundays at Flamingo, regardless of how many hours he worked. The extra $10 dollars he was paid on Saturdays and Sundays at Flamingo was to stay and clean after the bars closed at 4:00 a.m. until about 5:30 a.m. The waiters were required to stay and clean every shift regardless if they were paid the extra $10 or not. During this time, plaintiff Cardenas was given paystubs reflecting that he was paid $5.00 per hour although he was paid the flat rate of $40 per shift. Id at ¶ 9-10.

39. On or about January of 2015, the defendants started paying plaintiff Cardenas per hour at a rate of $5.00, and then $7.50 per hour beginning on or about March of 2016. However, the defendants did not include the hours worked past 4:00 a.m. that he stayed to clean. The only compensation for the extra time cleaning plaintiff Cardenas received was the extra $10 on Saturdays and Sundays at Flamingo that they kept paying the waiters even when they starting paying them hourly. The $10 extra for cleaning on Saturdays and Sundays at Flamingo was paid to the waiters separately and on the same days they stayed to clean. Id at ¶ 11-12.

40. Plaintiff Cardenas was not given any notice of a tip credit until January of 2015 when the defendants starting paying the waiters hourly. The notice of the tip credit was

verbal. Plaintiff Cardenas never received written notice of a tip credit. Furthermore, plaintiff Cardenas was only told that he would be paid less than the minimum wage because he received tips but was not told the amount of the tip credit. Id at ¶ 13.

41. Plaintiff Cardenas has not been paid for all hours that he has worked for the defendants. In addition, he was almost never paid time and a half for any hours he worked over forty (40) in a week and he was also not paid an extra hour's pay for days that he worked ten (10) hours or more. Id at ¶ 14.

42. Plaintiff Cardenas never received written notice of his hourly rate when he was hired or when his rate increased. Furthermore, plaintiff Cardenas was not paid on time and did not receive all of his paystubs. Plaintiff Cardenas would usually be paid every 3-5 months and estimates that he didn't receive about 20% of his paystubs. In addition, plaintiff Cardenas was paid in cash. The defendants would make him sign the back of his paychecks before he was paid. The defendants would then would keep his paychecks and give him his paystubs. Moreover, defendant D'Angelo would deduct what she claimed she paid in payroll taxes from plaintiff Cardenas' pay. Id at ¶ 15-18.

43. From 2011 to 2015, Plaintiff Cardenas punched in and out of work. However, most of the time the machine did not work. When the machine did work, the defendants required Plaintiff Cardenas to punch out at 4:00 a.m. when the bars closed although he had to stay until 5:30 a.m. to clean. When the defendants didn't make him punch in and out of work, he was only required to sign in but now sign out. Id at ¶ 20-21.

44. Furthermore, Plaintiff Cardenas was required to sign tip cards but sometimes the defendants would fill them out for him. Id at ¶ 23.

45. In addition, plaintiff Cardenas was required to pay $10 to the bartenders on every shift he worked and pay the busboys another $10 on busy weekend shifts. Id at ¶ 24.

### Facts relevant to Plaintiff Cesar Romero

46. Plaintiff Romero was employed as a waiter by the defendants from on or December 16, 2011 to on or about August 9, 2017. He worked at Flamingo and Doll's. Exhibit 12, Plaintiff Romero' Affidavit in Support, ¶ 3.

47. Plaintiff Romero helped defendant D'Angelo's husband unload supplies bought for both bars at the same time. The supplies included, but weren't limited to, toiletries, hand towels, straws, cups, napkins, and cleaning supplies. Plaintiff Romero helped unload supplies from defendant D'Angelo's husband's car at both bars. Also, plaintiff Romero would take supplies from Flamingo and bring them to Doll's because the supplies initially brought to Doll's when the supplies were bought weren't enough. Id at ¶ 4.

48. For most of the time that plaintiff Romero worked for the defendants, he would work five to six (4-5) days a week, eleven to twelve (11-12) hours a day. Thus, plaintiff Romero worked fifty-five to seventy-two hours (55-72) a week most of the time that he was employed by the defendants. Id at ¶ 5.

49. Up until on or about March of 2016, the defendants paid plaintiff Romero $40 per shift no matter how many hours he worked per shift except that on Saturdays and Sundays at Flamingo when the waiters were paid an extra $10 for cleaning the bar after it closed. The waiters stayed to clean the bar every shift they worked at either bar but were only paid the extra $10 for Saturdays and Sunday shifts at Flamingo. They were given the extra $10 at the end of those shift and separately from their other pay. Id at ¶ 6.

50. At some point the defendants starting giving plaintiff Romero paystubs that reflected that he was paid $5 an hour. However, he was still paid $40 per shift regardless of how many hours he worked per shift. On or about March of 2016, the defendants starting paying the him $7.50 per hour. However, he still was not paid for the hours spent cleaning the bars at the end of every shift, except for the $10 extra he was paid on Saturdays and Sundays at Flamingo.  Id at ¶ 7-8.

51. Plaintiff Romero has not been paid for all hours that he has worked for the defendants. In addition, he was rarely paid time and a half for any hours worked over forty (40 ) in a week and he was also not paid an extra hour's pay for days that he worked ten (10) hours or more. Id at ¶ 9.

52. Furthermore, plaintiff Romero did not receive written notice of his hourly wage when he was hired or when his pay rate changed. In addition, the defendants did not pay him weekly but instead he was paid one or two times a year, except for a period of time after defendant D'Angelo starting paying the waiters $7.50 an hour where she would pay the waiters daily, but not for long. Defendant D'Angelo would make plaintiff Romero sign the back paychecks before she paid him and always paid him in cash. She would never pay everything she owed him and always owed him backpay. Moreover, she would deduct the amount he was owed by what she said she had paid in payroll taxes for him.  In addition, defendant D'Angelo always paid plaintiff Romero at the same time for both bars when he would sign the paychecks and receive paystubs, but he almost did not receive any paystubs or sign any checks in 2017. Id at ¶ 10-15.

53. Plaintiff Romero was required to punch in and out of work. However, the machine rarely worked. Also, when he did punch out, he was forced to at 4:00 a.m. when the bar closed although he stayed to clean. The defendants eventually took away the machine sometime in 2015. Furthermore, plaintiff Romero never punched in or out

when he covered someone else's shift. When plaintiff Romero didn't punch in and out, he was required to sign in but not sign out. Id at ¶ 16-17.

54. Plaintiff Romero never received written notice of a tip credit. He was only told verbally that he would be paid less than the minimum because he received tips when the defendants starting paying him hourly in January of 2015.The defendants made him sign tip cards but sometimes the defendants filled them out for him. Id at ¶ 18-19.

55. Furthermore, plaintiff Romero was required to pay the bartenders $10 per shift and also the busboys when they worked sometimes. Id at ¶ 20.

### Facts relevant to Plaintiff Jose David Perez Mejia

56. Plaintiff Jose David Perez Mejia was employed by defendant D'Angelo as a waiter at her bars, Flamingo and Doll's, from on or about August of 2014 to on or about August 2016. He worked at shifts at both bars every week like all the waiters were required to. He usually worked four to five (4-5) days a week, from ten to twelve (10-12) hours a day. Exhibit 8, Plaintiff Perez Mejia's Affidavit in Support, ¶ 3-4, 6.

57. Plaintiff Mejia was always paid in cash and never received any paystubs or checks from the defendants. He was paid daily. From August of 2014 to March of 2016 he was paid $40 per shift, except for Saturday and Sunday shifts at Flamingo where he was paid an extra $10, regardless how many hours he worked. He was paid the extra $10 per shift on Saturdays and Sundays at Flamingo because he stayed to clean after the bar closed for about an hour to two. He also stayed to clean for all his other shifts at both bars but did not receive the extra $10. Id at ¶ 7-8.

58. From March 2016 to August 2016, the defendants starting paying plaintiff Perez Mejia hourly at a rate of $7.50.  However, he was still was not paid for the extra time cleaning after the bars closed, except for Saturday or Sunday shifts at Flamingo where he would still get an extra $10 to stay and clean. Since his shifts were usually ten (10) hours, not including the time spend cleaning after the bars closed, his pay would usually be $75 for all shifts except for Saturdays and Sundays at Flamingo where he would be paid $85. Plaintiff Perez Mejia was not paid time and a half for hours worked over forty (40) in one week or an extra hour's pay for working more than ten (10) hours in one day. Id at ¶ 9-10.

59. Although plaintiff Perez Mejia saw that there was a punch in machine at Flamingo, he was never required to punch in. He was only required sign a check in sheet when he started all my shifts. When he was paid at the end of the day, he signed a notebook with the hours he worked for the day and the pay. However, the hours never included the extra time cleaning. Id at ¶ 11.

60. The defendants also never told plaintiff Perez Mejia that he would be paid less than the minimum wage because he would also make tips. He was never notified of any tip credit. Id at ¶ 12.

61. In addition, plaintiff Perez Mejia was required to pay the bartenders $10 every shift during the entire time he worked for the defendants. Id at ¶ 13.

### Facts relevant to Plaintiff Alejandro Vargas

62. Plaintiff Vargas worked for the defendants as a waiter for more than ten (10) years. He started at Flamingo on or about March of 2006 and was hired by defendant D'Angelo. He stopped working for the defendants on or about August of 2016. Plaintiff Vargas also working at defendant D'Angelo another bar, Doll's, when she opened it in around 2010 or 2011. Defendant D'Angelo required all the waiters to work at both bars every week. Exhibit 14, Plaintiff Vargas Affidavit in Support, ¶ 3-4.

63. When plaintiff Vargas started to work for the defendants, he was paid $20 per shift. Sometime between 2006 and 2011 the defendants started paying the waiters $40 per shift. He cannot recall exactly when they started to pay the waiters $40 per shift because it was so long ago. Starting around 2010, the defendants started to pay the waiters an extra $10 at Flamingo on Saturdays for cleaning up after the bar closed. Plaintiff Vargas worked at Doll's on Sundays so he does not have specific knowledge as to whether the defendants also paid the extra $10 on Sundays at Flamingo. Id at ¶ 5.

64. Up until about 2008, plaintiff Vargas worked six (6)  shifts of about thirteen (13) hours each per week. After 2008, Flamingo began to open later so he worked less hours. Since then up to when he was terminated, he usually worked five to six (5-6) days a week, eleven  to eleven and a half (11 to 11 ½)  hours per shift, for a total of approximately fifty  to sixty-nine hours a week. Id at ¶ 6.

65. Plaintiff Vargas was never giving any notice of my pay rate other than when he was verbally told that he would be paid $40 per shift. He was never given any written notice of any pay rate. He was never giving any notice, either verbal or written, that he would be paid less because he  received tips. Plaintiff Vargas was paid in cash for most of the time that he worked for the defendants except for a period of about a year where he was paid by check. The defendants never gave any of the waiters any paystubs until they were sued in 2008 for unpaid wages by about twenty (20) employees. This is when he started to get paid by check. After almost one year of paying plaintiff Vargas and the other waiters by check, the defendants started to pay them by cash again. They would make them sign the paychecks before they were paid in the cash. Then they would keep the paychecks and give them the paystubs. Id at ¶ 7-10.

66. Plaintiff Vargas and all the other waiters were paid until the bar closed at 4:00 a.m. He was not compensated for the extra hour to hour and a half spent cleaning the bars except the extra $10 for cleaning at Flamingo on Saturdays. The extra $10 was always paid in cash on the same day the waiters cleaned. Thus, he has not been paid

for all hours that he has worked for the defendants. In addition, plaintiff Vargas was
not paid time and a half for hours worked over forty (40) in a week and was also not
paid an extra hour's pay for days that he worked ten (10) hours or more. <u>Id</u> at ¶ 11-13.

67. Furthermore, plaintiff Vargas and the waiters were never paid on time. Defendant
D'Angelo would pay him a couple of times a year. One time she didn't pay him for a
year and a half. Defendant D'Angelo never paid plaintiff Vargas everything she owed
him and still owes him at least three (3) months of wages, even though she made him
come back after he was terminated to sign back paychecks. <u>Id</u> at ¶ 14.

68. Plaintiff Vargas was required to sign in when he arrived at the bars but not when he
left. He was also required to punch in and out for a period of time but then the
machine broke. <u>Id</u> at ¶ 15.

69. In addition, plaintiff Vargas was required to pay the bartenders $10 every shift and
sometimes another $10 to the busboys. <u>Id</u> at ¶ 16.

## <u>Facts relevant to Plaintiff Christian Canas</u>

70. Plaintiff Canas worked for the defendants from on or about November of 2015 to on
or about January of 2017 as a waiter. Exhibit 15, Plaintiff Canas' Affidavit in
Support, ¶ 3.

71. Plaintiff Cardenas worked four days at Flamingo when he first started. After four or
five months of his employment started, he starting working two days at Flamingo and
two days at Doll's, per week. Plaintiff Canas was paid $40 per shift until on or about
March 2016 where he started getting paid $60. It is his belief that the defendants
raised the rate to $60 per shift because the hourly rate went up, however, he never
received any paystubs or other notice of his hourly rate. He was only told verbally
what his pay would be per shift. <u>Id</u> at ¶ 4-5.

72. When plaintiff Canas was paid, he had to sign a receipt. The defendants would put the
amount of money he was paid and the hours he worked that day on the receipt.
However, the defendants would always put that he left at 4:00 a.m. when the bar
closed although he stayed to clean to about 5:30 a.m. On Saturdays and Sundays at
Flamingo the waiters would be paid an extra $10 for cleaning the bars. However, they
werenot paid the extra $10 for any other shift although they still had to stay and clean.
Plaintiff Canas worked at Doll's on Saturdays and Sundays so usually did not receive
the extra $10.   <u>Id</u> at ¶ 6-7.

73. Plaintiff Canas never signed any paychecks like some of the other plaintiffs in the
case. He would only receive a W2 at the end of the year. <u>Id</u> at ¶ 8.

74. Plaintiff Canas usually arrived at work at 5:00 p.m. when he worked at Flamingo and
6:30 p.m. when he worked at Doll's, and left work at about 5:30 a.m. every shift,
except for about the last four or five (4-5) months where he would come in at 8:00

p.m. against defendant D'Angelo's wishes. He was the only waiter able to get away with coming in that late because he sold a lot of bottles during his shifts.  Plaintiff Canas continued to work four days a week up until the last six months of his employment when he started working only two days a week. During this period, he worked his Wednesday and Friday shifts at Flamingo and no shifts at Doll's. Thus, up until his last six months of employment he worked two (2) twelve and a half (12 ½) hour shifts at Flamingo and two eleven (11) hour shifts at Doll's for a total of forty-six and a half (46 ½) hours a week. <u>Id</u> at ¶ 9 -10.

75. Plaintiff Canas was never paid any overtime wages when he worked more than forty (40) hours a week or any extra wages for working ten (10) or more hours a day. In addition, he was not paid for all the hours that he worked. <u>Id</u> at ¶ 11.

76. Plaintiff Canas was never giving any notice, either verbal or written, that he would be paid less because he  received tips. <u>Id</u> at ¶ 12.

77. Plaintiff Canas never punched in or out of work. To the best of his knowledge, only the waiters that worked for the defendants for much longer than him were required to punch in and out. He was only required to sign a notebook when he  arrived. He was never required to sign out. <u>Id</u> at ¶ 13.

78. Additionally, plaintiff Canas was always required to pay the bartenders $10 every shift and $10 to the busboys when the bars had them. <u>Id</u> at ¶ 14.

### **Facts relevant to Plaintiff Angely Peralta**

79. Plaintiff Peralta was employed by the defendants on and off from about to 2007 to 2017 as a waitress and bartender at Flamingo's and Doll's, and as a cashier once a week at a third bar owned by defendant D'Angelo named Palatium. Her last date of work for the defendants was on or about March 15, 2017. From on or about December 31, 2013 to on or about March 15, 2017, plaintiff Peralta worked as a waitress. These are the dates that she put on her Consent to Collective Action form because she didn't know that she could also recover for wages she is owned for when she worked as a bartender before December 31, 2013. Exhibit 11, Plaintiff Peralta's Affidavit in Support, ¶ 3-5.

80. Plaintiff Peralta worked at both Flamingo's and Doll's every week. Usually, she worked anywhere from ten and a half (10 ½) hours to twelve (12) hours a day, four (4) days a week., for a total of about forty two to forty eight (42 to 48) hours a week. <u>Id</u> at ¶ 6-7.

81. Defendant D'Angelo paid plaintiff Peralta cash most of the time. Plaintiff Peralta can only recall getting paid by check four or five (4 or 5) times. When she first started, the waiters and bartenders were paid $40 per shift at the end of the night no matter how many hours they  worked. The waiters were paid an extra $10 for Saturday and Friday shifts at Flamingo but most weekends she was at the other bars. <u>Id</u> at ¶ 8-10.

82. On or about January of 2015, the defendants started giving plaintiff Peralta paystubs that stated that she was paid $5 per hour but she was still paid $40 per shift no matter how many hours that she worked. On or about March of 2016, the defendants started paying her $7.50 an hour instead of per shift. However, she was still not compensated for all hours she worked. The defendants did not pay her for the time spent cleaning the bars after they closed at 4:00 a.m., except for the extra $10 they continued to give the waiters on Saturday and Sunday Shifts at Flamingo. Id at ¶ 11-12.

83. Plaintiff Peralta was never paid any overtime pay or any extra pay for working for than ten (10) hours a day. Id at ¶ 13.

84. When the defendants started paying their employees hourly on or about March of 2016, they stopped paying plaintiff Peralta daily and started paying her sporadically. At one time she was owed about one (1) year of wages. Defendant D'Angelo would deduct what she said that she paid in payroll taxes for plaintiff Peralta when she paid her. Id at ¶ 14-15.

85. Plaintiff Peralta was never given any notice, written or oral, that she would be paid less than the minimum wage because she made tips. Furthermore, she never received written notice of how much she would be paid. Id at ¶ 16-17

86. Plaintiff Peralta recalls that for some time during her employment, the waiters and bartenders had to punch in and out of work. However, she believes this period was only for about six (6) months because the machine was always broken. Other than punching in and out of work, she only had to sign in but never sign out of work. Id at ¶ 18-19.

87. Furthermore, plaintiff Peralta and all the other waiters each had to pay the bartenders $10 every shift and sometimes another $10 each to the busboys. Id at ¶ 20.

### Facts relevant to Plaintiff Raidel Garcia

88. Plaintiff Garcia was employed by the defendants as a waiter at their bars, Flamingo and Doll's, from on or about February of 2012 to on or about April of 2014. Exhibit 12, Plaintiff Garcia's Affidavit in Support, ¶ 3.

89. Defendant D'Angelo hired plaintiff Garcia and told him that he was required to work at both bars. He was hired at defendant D'Angelo's office on the second floor of Flamingo. Each week he worked shifts at both bars like all the other waiters, but worked more shifts at Doll's. Id at ¶ 4-5.

90. Defendant D'Angelo told plaintiff Garcia that he was going to be paid $40 per shift when she hired him. She never told him what his hourly rate was or gave him any notice about an hourly rate. Furthermore, he was also never told, or received any written notice, that he would be paid less because he would receive tips. He was paid

$40 per shift for the entire time that he worked for defendant D'Angelo. She would pay him an extra $10 for cleaning after the bar closed when he worked at Flamingo on Saturdays. He usually did not work on Sundays. Id at ¶ 6-7.

91. Plaintiff Garcia worked about forty-six (46) hours a week. He usually worked four (4) days a week consisting of three (3) twelve (12) hour shifts and one (1) ten (10) hour shift. Id at ¶ 8.

92. Defendant D'Angelo paid plaintiff Garcia in cash. She would make him sign the back of his paychecks before she would pay him and then keep the paychecks. Defendant D'Angelo would pay him every few months. Sometimes she would not pay her employees for anywhere from three to five (3-5) months. He recalls that one time she did not pay him for about a year. He did not receive paystubs weekly. Plaintiff Garcia was paid the extra $10 for cleaning at Flamingo on Saturdays separately and on the same day he cleaned. Id at ¶ 9-11.

93. Plaintiff Garcia was required to sign in when he arrived at work but never to sign out. He would sign a notebook. He was also required to punch in and punch out. Id at ¶ 12.

94. Plaintiff Garcia was paid less than the minimum wage by the defendants and never paid time and a half for overtime hours. Moreover, he was never paid any extra wages for working shifts of ten (10) hours or more.. Id at ¶ 13.

95. In addition, he and all the waiters were required to pay the bartender $10 per shift. Id at ¶ 14.

Dated: Astoria, New York
      October 5, 2020

**THE ROSE LAW GROUP, PLLC**

 /s/Jesse C. Rose_____
Jesse C. Rose, Esq.
*Attorney for Plaintiff*
The Rose Law Group PLLC
31-09 Newtown Ave.; Suite 309
Astoria, NY 11102
Tel: (718)-989-1864
Fax: (917) 831-4595
